IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WAUKESHA COUNTY, WISCONSIN
and WAUKESHA COUNTY DEFERRED
COMPENSATION PLAN,

                 Plaintiffs,

     v.

NATIONWIDE LIFE INSURANCE
COMPANY and NATIONWIDE
RETIREMENT SOLUTIONS, INC.,

                 Defendants.

OPINION AND ORDER

06-C-0656-C

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This civil case for money damages arises out of plaintiff Waukesha County's termination of a contract under which defendant Nationwide Life Insurance Company was to provide a deferred compensation plan for plaintiff's employees.  In the fall of 2005, plaintiff decided to undertake a competitive evaluation of the two deferred compensation options it offered its employees, one of which had been run by defendant since 1985.  At the end of the evaluation period, plaintiff chose one company, ICMA, to be its sole provider and notified defendant it would be terminating its contract and seeking a return of funds in a lump sum.  Under the contract, choosing the lump sum option subjected the funds to a

1

"market value adjustment"; had plaintiff chosen to take its funds out over a five-year period no such adjustment would have been imposed.  Plaintiff had obtained an estimate from defendant in September 2005 that the adjustment would be about $43,230 (based on a hypothetical withdrawal of the funds at that time).  In June 2006, after the contract had been terminated, plaintiff learned to its dismay that primarily because of changes in the Lehman Baa Index, the market value adjustment on the lump sum withdrawal would be 4.09% of the corpus, or approximately $541,925.

Smarting from this turn of events, plaintiff sued defendant and the plan administrator, Nationwide Retirement Solutions, Inc., alleging that the two companies had breached the parties' group fixed retirement contract by the way in which they calculated the value of the funds in plaintiff's account.  (In their brief in response to defendant's motion for summary judgment, they add the contention that defendant breached the contract in another way, by not providing plaintiff with its procedures for determination of the market value adjustment.)  Plaintiff, together with plaintiff Waukesha County Deferred Compensation Plan, contends that defendants breached their duty of good faith and fair dealing by relying on a highly biased calculation, failing to provide complete information and providing misleading information; that defendants made actionable misrepresentations (negligent, intentional and strict liability) on which plaintiff Waukesha County relied to its detriment; and that defendants violated their fiduciary duty to plaintiffs.  Defendants deny

2

any breach of the contract or of the duty of good faith, deny that they failed to provide any information that plaintiffs requested or that they sent plaintiffs false and misleading information and deny that they received a windfall from the way in which they calculated the adjustment to plaintiff's funds upon termination.  Instead, they say, the adjustment they made in the market value of the funds was determined according to the terms of the contract and plaintiffs had or could have had for the asking any information about the process that they wanted.

The case is before the court on defendants' motion for summary judgment.  I conclude that there is a slight possibility that plaintiffs can show that defendants breached the parties' fixed retirement contract by the manner in which defendants made their adjustment to the market value of the funds and specifically, by the way they measured net capital loss.  I conclude that plaintiffs cannot show that defendants failed to respond to any requests from plaintiff for information about defendants' then current company procedures for determination of market value adjustment.  I conclude that defendants did not make any misrepresentations in connection with the market value adjustment that would have misled plaintiffs into waiting to complete their competitive evaluation and that even if they did, plaintiffs could not have relied reasonably on the statements.  The allegations of breach of good faith fall with the conclusion that defendants did not make misrepresentations to plaintiffs.  Finally, I conclude that plaintiffs cannot maintain a claim of breach of fiduciary

3

duty against plaintiffs.

From the facts proposed by the parties, I find that there is no dispute about the following material facts.

## UNDISPUTED FACTS

Plaintiff Waukesha County is a body corporate in the state of Wisconsin and sponsor of the plaintiff Waukesha County Deferred Compensation Plan, which is a 457 deferred compensation plan that holds assets in trust for plan participants. (The Plan has no role in this litigation so all further references to "plaintiff" will be to the county only.). Participants in the Plan include eligible public employees of Waukesha County who signed a participation agreement and agreed to be bound by the terms of the Plan.

Defendants Nationwide Life Insurance Company and Nationwide Retirement Solutions are corporations organized under the laws of the state of Ohio and legal entities distinct from one another. Plaintiff and defendant Nationwide Life entered into a Group Fixed Annuity Contract in 1985, which was administered by defendant Nationwide Retirement. (Further references to defendant will be to the life insurance company, except in those few instances in which I refer specifically to defendant Nationwide Retirement Solutions.)

Pursuant to the document governing the Plan, contributions made by plan

4

participants are held in trust by plaintiff for the benefit of plan participants. Plaintiff does not make any financial contributions to the Plan for the benefit of plan participants and all Plan expenses are charged back to plan participants. Plaintiff bears none of the costs and has no funds involved in the Plan.

From 1996 until February 2006, the Plan offered plan participants two different investment options: (1) a plan endorsed by the National Association of Counties (NACo) that was issued by defendant and administered by defendant Nationwide Retirement; and (2) a plan administered by the International City/County Management Association's ICMA Retirement Corporation (ICMA). The Nationwide plan option included two contracts: a fixed annuity contract and a variable annuity contract. The fixed annuity contract was a group fixed fund retirement contract; it is a fixed and enforceable contract between the parties.

Until 1996, the Nationwide contracts were the only investment option available to plaintiff's employees. In 1996, plaintiff solicited requests for investment options to be offered to plan participants. At the time it was aware that its fixed annuity contract with defendant included a provision for the imposition of a market value adjustment upon termination of the fixed contract. After the solicitation period. plaintiff added an investment offered through ICMA as a second option for plan participants.

In 2005, plaintiff undertook a competitive evaluation of its two deferred

5

compensation plan administrators.  Its intent was to award a contract to the successful vendor by September 28, 2005, but it delayed the award to obtain additional reactions from its employees.  At the conclusion of the period, plaintiff selected ICMA as its sole provider, eliminating defendant.  In deciding which plan administrator it would select, plaintiff did not take into consideration the market value adjustment it might have to pay if it terminated its contract with defendant.  However, it was aware from a number of sources that paying such an adjustment was a possibility.  (1) The market value adjustment provision had been part of the contract between the parties since their relationship began in 1986.  (2) During the competitive evaluation period in 2005, ICMA had informed plaintiff about the possibility that the contract might contain a market value adjustment provision.  ICMA also told plaintiff that "[c]osts are also extremely difficult to estimate since fluctuation and interest rates can greatly impact the level of market value adjustments," Peter Hans Dep., July 16, 2007, dkt. # 37, at 172 and exh. #13 to Dep., and it told plaintiff it had the right to ask for the formula that the investment plan vendor was assessing.  (3) Defendant told plaintiff during the information collecting period that if it were selected as sole provider under the Plan, it would waive all restrictions on plan participants' transfers of assets from the fixed account and would eliminate the market value adjustment provision from the fixed contract.  (5) In early September 2005, plaintiff asked for and received an estimate of the market value adjustment it would pay if withdrawal took place then and a copy of the

6

assumptions under which the market value adjustment was made.

On February 26, 2006, plaintiff's Board of Supervisors formally selected ICMA as the sole provider of services and plan administrator for the Plan. Two days later plaintiff advised defendant of its intention to terminate the fixed annuity contract. The suspension of the fixed annuity contract triggered a contract termination date during June 2006.

The fixed annuity contract provided that upon termination defendant will pay the balance of the deposit fund to the owner either in sixty monthly installments or in a lump sum. If the lump sum option is selected, defendant will pay the owner the

> amounts so withdrawn, multiplied by 100% minus the applicable contingent deferred sales charge in Section 2.05, *less the amount of the market value adjustment.* The market value adjustment is the amount which the Company determines, in accordance with its then current procedures applicable to all Contracts of this type and class, would be the net capital loss, if any, resulting to the Company if investments were liquidated to make the lump sum withdrawal. The then current Company procedures for determination of the market value adjustment will be provided to the Owner on request.

(Emphasis added.)

Defendant views the market value adjustment as a mechanism to make its other clients whole in a market in which bond rates are rising and to shelter its general account from the impact of a lump sum withdrawal by a large customer. Because defendant does not segregate its public employee deferred compensation funds, it cannot simply return to the fund sponsor the assets "owned" by the participants. Instead, according to the Nationwide

Market Value Adjustment Assumptions, which defendant gave plaintiff on September 8, 2005, defendant calculates what the assets would be worth if it were to sell them. It does this in a manner that would not be intuitive to lay persons. The first of its adjustment assumptions is that the net cash flow it receives from participants in each calendar quarter is invested in a 10-year semi-annual coupon bond purchased at par and callable after 5 years at par. Norman Decl., exh. #6, dkt. #44. The rate on that bond is assumed to be the actual rate earned on investments acquired in that quarter having an average quality of Baa. Id. These assumptions produce a set of hypothetical assets that in defendant's opinion reasonably represent the actual portfolio. Id. The market rate, which is different from the bond rate, assumes that any asset sold would have a rating of Baa and that the current market rate is the Lehman Corporate Baa Credit Yield. Id. to calculate the market value adjustment, defendant calculates the "book value" and the "market value" of each hypothetical asset. The book value is the accumulation account balance increase plus the amount reinvested during the quarter from a prior quarter's maturing hypothetical asset less any hypothetical asset sales resulting from accumulation account decreases in later quarters. Id. The market value is the present value of the hypothetical asset discounted at the current market rate. Id. The market value adjustment is the amount by which the total book value exceeds the total market value. Id. If the total book value is less than the market value, no market value adjustment is made. Id.

8

Defendant explains that it uses this method of calculating the net payable to plan sponsors on withdrawal because it would be administratively complex to try to determine the value of the particular financial holdings of each separate plan, out of the many it administers in its fixed account pool.  Defendant believes that if it paid plan sponsors the book value of their investments, the holdings of existing participants would suffer to the extent that the book value of the withdrawing plan exceeded the market value at the time of withdrawal.  As this case shows, that scenario can happen.  A lower yielding bond purchased for $100 would have a book value of $100 (plus accumulated interest) but it would not sell on the open market for its purchase price plus interest if bond yields had escalated since it was purchased.  Defendant is obligated by the fixed annuity contract to guarantee the plan participants a certain income.

Plaintiff may not have understood the precise workings of defendant's procedures for determining a market value adjustment but, as of September 8, 2005, it knew the broad outlines of the market value adjustment, knew that defendant assumed that the assets were rated at Baa and was aware that the Lehman Baa Credit Index would be one of the factors determining the amount of any future market value adjustment assessed by defendant. Plaintiff was also informed that the adjustment as of September 7, 2005 would have been approximately $43,230, that the final adjustment would not be calculated until five business days before the effective date of withdrawal, that withdrawal would occur approximately four

9

months after the notice of termination and that the adjustment was subject to change as a result of market conditions.  Plaintiff did not try to track the Lehman Baa Credit Index itself or through its consultant Michael Stewart.   It never asked defendant for any new calculations of the market value adjustment until February 2006, when it learned that the market value adjustment had risen to $315,786.  On June 14, 2006, defendant informed plaintiff that the market value adjustment would total 4.09% of the total plan assets, or about $541,925.  A major contributing factor was a change in the Lehman Baa credit rate.

Defendant makes certain "fact sheets" available on its website.  It does not regularly mail these sheets to plan sponsors or plan participants but it did provide plaintiff a copy of a fact sheet for the quarter ending March 31, 2005 in connection with the competitive evaluation process in the fall of 2005.  (Defendant mails quarterly statements to plan participants that are specific to each plan participant.  It mailed such statements to plaintiff on a quarterly basis from 1984 until the plan was terminated in 2006.).

Until the second quarter of 2006, the fact sheets contained statistical information relating to investments held by defendant in its general account.  This was not made clear in its fact sheets, which bore the heading "Nationwide Fixed Account for USCM/NACo Cases."   The March 2005 Fact Sheet contained information such as a summary of investments and investment performance for defendant's entire general account and showed that the average quality of the account was "A" and the average duration was 4.2 or 4.3.

10

(Average duration is a measure of volatility in relation to interest rate movement.). The general account is the pool of investments backing the investments supporting fixed contracts issued by defendant. The investments purchased by defendant to support its obligations under the fixed contract were held in the general account. Defendant does not maintain a separate account for each customer that has a fixed contract with the company. Contributions (or "deferrals") made by participants of any 457 deferred compensation plan such as plaintiff's are just one pool of all of the total assets making up the general account.

The fact sheets did not purport to include all information. For example, under "Types of Holdings," the March 31, 2005 and September 30, 2005 fact sheets listed "*examples* of General Account assets having the largest concentrations." Exh. #15 to Hans Dep., dkt. #37, at WC000152, WC000150 (emphasis added). The pie chart showed that mortgages made up 23% of the investments and the definitions section explained that mortgages were not rated.

In or about November 2005, plaintiff obtained a copy of the fact sheet for the quarter ending September 30, 2005 from defendant's website. In mid-February 2006, after plaintiff learned of the increase in the estimated market value adjustment, it asked for and received from defendant a fact sheet for the quarter ending December 31, 2005. Around the same time, plaintiff sent defendant formal questions regarding the market value calculation and the characteristics of the holdings in the fixed account. It did not ask for defendant's then

11

current procedures or the formula used the determine the market value adjustment.  From the March and September 2005 fact sheets, plaintiff had concluded that the fixed account was not particularly vulnerable to interest rate fluctuations and that defendant's estimate of the market value adjustment was unlikely to fluctuate significantly in light of its high credit quality and relatively low duration.

All of the facts sheets provided to plaintiff indicate that some of the statistical information provided does not apply to all of the investments held in the general account. For example, on the March 31 and September 30, 2005 fact sheets, the "Definitions" section indicates states that the "Average Credit Quality" statistic is not available for mortgages.  In the December 31, 2005 fact sheet, the rating disclaimer adds "and private placement bonds" and places the disclaimer on the first page.  The pie chart shown on the first page of the March 31, 2005 fact sheet indicates that 23% of the general account assets are held in mortgages.  Similar information is shown on the first page of the September and December 2005 fact sheets, except that in the December sheet, "mortgages" has been replaced with "CML's (Commercial Mortgage Loans)" on the pie chart and Average Duration is no longer shown.

Defendant removed the average duration statistic from the fact sheets beginning with the sheet issued for the quarter ending December 31, 2005 in part because it had learned that one of its customers was trying to use the information to calculate the market value

12

applicable to its contract and in part because it believed the statistic was unnecessary in light of other information in the fact sheets. In March 2006, defendant advised plaintiff that the duration of the fixed account, including mortgages, was approximately 5.73 and that the Lehman Baa Corporate Credit Index had an average duration of at least 6.48.

In the second quarter of 2006, defendant decided to revise its fact sheets so that they would no longer reflect the assets of the entire general account but would provide investment information relative to only what are known as "Pool 13" assets. These assets include all those held by defendant to support plans such as the one plaintiff sponsored. (The general account assets support defendant's obligation to plan participants in the event of default; the Pool 13 assets purchased by defendant support its obligation to plan participants other than in the event of default.). The total value of Pool 13 assets is considerably smaller than the total assets of the general account and the investment strategy is slightly different.

During September 2005, plaintiff began looking at the fact sheet that had been provided by defendant during the information process to gain an understanding of the characteristics of the fixed account assets that pertained to its contract and it used that information in its evaluation process. It did not use the fact sheets in an attempt to calculate the market value adjustment that would be assessed by defendant if plaintiff terminated the fixed contract and chose a lump sum distribution.

Before February 2006, plaintiff did not realize that the fact sheet contained

13

information relative to the entire general account and not just to the assets held by defendant to support its obligation to plaintiff under the fixed contract.  It came to this realization some time toward the end of February and the beginning of March 2006.  At that point, it began to think that the fact sheets provided it by defendant were false and misleading.

On February 28, 2006, plaintiff notified defendant of its decision to take a lump sum withdrawal of the account assets.  It considered several methods for funding the adjustment and finally concluded that it would take one of several loan options from ICMA (the new sole provider of the 457 deferred compensation plan) to cover the expense of the adjustment. The revenue sharing arrangement was reduced from roughly $68,000 annually to $5,000 annually and the yield paid on the investments of plan participants in the Value Plus Fund offered by ICMA was reduced by .346%.  Defendant has not incurred any damages as a result of the market value adjustment; the effect of the adjustment is borne by the plan participants.

OPINION

Plaintiff stated eight causes of action in its second amended complaint, six of which are still operative.  Those six are (1) breach of contract; (2) breach of the duty of good faith

14

and fair dealing; (3), (4) and (5) negligent, intentional and strict liability misrepresentation claims and (6) breach of fiduciary duty. All six rest essentially on two contentions: (1) defendant breached the parties' group fixed fund retirement contract by failing to measure net capital loss, if any, when determining the market value adjustment it charged; and (2) defendant provided misleading information about the investments in the fact sheets that it gave plaintiff and posted on its website.

### A. Breach of Contract

#### 1. Market value adjustment

Although the market value adjustment was part of the fixed group contract from the beginning of the parties' relationship, plaintiff objects to defendant's deduction of the adjustment upon plaintiff's termination of the contract. In its complaint, plaintiff alleged that defendant's calculation breached the contract because it failed to "net gains (income received and principal appreciation) and losses (lower asset prices) to arrive at the MVA and fail[ed] to tie the adjustment to actual capital losses." Sec. Am. Cpt., dkt. #18, at 9-10. In other words, as plaintiff explains in its brief, defendant failed to utilize a market value adjustment formula that "reasonably represents 'the net capital loss, if any, resulting to [defendant] if investments were liquidated to make the lump sum withdrawal.'" As I understand it, plaintiff is alleging also that the adjustment breached the contract because it

15

was based on a hypothetical portfolio and credit index that did not represent the actual investments in the fixed account.

The difficulty with plaintiff's argument is that the contract states clearly that if the owner (plaintiff) chooses a lump sum distribution of the deposit funds, the funds will be turned over to plaintiff, minus a contingent deferred sales charge that plaintiff does not contest and less a market value adjustment.  This adjustment will be the "amount the Company determines, in accordance with its then current procedures applicable to all Contracts of this type and class, would be the net capital loss, if any, resulting to the Company if investments were liquidated to make the lump sum withdrawal."  Having agreed to this condition, and having never alleged that defendant did not follow its then current procedures when calculating the adjustment, plaintiff is not in a strong position to argue that defendant breached the contract when it determined the market value adjustment in accordance with its then current procedures.  Its only possible argument is that the procedures themselves did not accord with the contractual provision that defendant would determine the "net capital loss, if any, resulting to [defendant] if investments were liquidated to make the lump sum withdrawal."

Defendant maintains that its procedures achieved this result.  However, all that it has produced on the subject is an affidavit of Robert Longfellow that it submitted after plaintiff had filed its brief in opposition to defendant's motion for summary judgment.  Dkt. #48.

16

Longfellow is defendant's Director of Management Information for Actuarial.  It is his task to perform the market value adjustment when a plan sponsor such as plaintiff decides to terminate a group fixed fund annuity contract and elect a lump sum withdrawal.  Longfellow avers that  "gains and losses were summed and there was an overall net loss" when he calculated plaintiff's assets.  Id. at 4.  He avers also that "[t]he Lehman Baa Credit Index, which is one component of [defendant's] MVA calculation, reasonably approximates the quality and nature of the investments purchased by [defendant] to back its obligation to governmental 457 deferred compensation plans such as" plaintiff's.  Longfellow may be absolutely correct in his averments, but he has not explained why.  As a layperson, I cannot gauge the validity of his statements.  (In the same affidavit, Longfellow discussed an incident in which defendant had actually sold investments to cover its obligation to another plan sponsor choosing a lump sum withdrawal.  Longfellow averred that the liquidation of those assets worked out to just 3% more than the market value adjustment defendant had calculated under its formula.  Had this affidavit been filed at a time when plaintiff could have responded to it, I might have reached a different decision on defendant's motion.)

On the present state of the record, I believe that plaintiff has alleged enough to raise a jury issue on the question whether defendant's calculation produces the equivalent of the net capital loss that defendant would incur if the investments in plaintiff's 457 deferred compensation plan were liquidated to make the lump sum withdrawal.  Defendant's late filed

17

affidavit does not carry its burden of showing that no triable issue remains.

Of course, at trial, it will be up to plaintiff to prove that defendant's calculation of market value adjustment does not produce a result that is the equivalent of the net capital loss that defendant would incur if investments were liquidated to make the lump sum withdrawal. I do not understand plaintiff to be arguing that defendant was required to calculate (or incur) an "actual" capital loss or even to "tie" the market value adjustment to an actual loss. I would not let it make that argument.

So far, plaintiff has done little more than allege how it thinks defendant made its calculation. This lack of evidence at a crucial time in the litigation could support a grant of summary judgment for defendants. However, the present record leaves enough questions to persuade me that a jury should be allowed to sort out the parties' differences.

2. Alleged failure to respond to requests for information about the market value adjustment

Plaintiff contends that defendant breached the contract by not providing information about the way in which it calculated the market value adjustment but the facts do not support its contention. The contract provides that "[t]he then current Company procedures for determination of the market value adjustment will be provided to the Owner on request." Plaintiff asked defendant for a calculation of the market value adjustment in September 2005; it received the calculation and the Nationwide Market Value Adjustment Assumptions

18

document, summarizing the method used to calculate the adjustment.  If plaintiff wanted more information, such as the formula that defendant used for the calculation, it never asked for it.

## B. Breach of Duty of Good Faith and Fair Dealing

Plaintiff contends that defendant breached the duty of good faith and fair dealing that attends every contract by imposing a highly biased market value adjustment, by failing to give plaintiff complete information about the market value adjustment and by providing misleading information relating to the fixed account holdings.  A party violates the duty of good faith when it acts in a manner that undermines the purpose of the contract, even if all the terms of the written contract have been fulfilled.  Foseid v. State Bank of Cross Plains, 197 Wis. 2d 772, 796, 541 N.W.2d 203, 212 (Ct. App. 1995).  This includes acts that violate community standards of decency, fairness or reasonableness, or that consist of subterfuges and evasions, "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  Id. at 796-97, 541 N.W.2d at 213 (quoting Restatement(Second) of Contracts, § 205 at cmt. d).

The jury will be deciding whether defendant calculated the market value adjustment

19

on the fixed account correctly, in order to determine whether defendant breached the contract.  If it determines that defendant breached the contract, the alleged breach of the duty of good faith will fall by the wayside.  If the jury finds no breach, I cannot conceive of any evidence plaintiff could adduce to prove that defendant's calculation was an evasion of the spirit of the bargain, a subterfuge, an abuse of power or otherwise a violation of the duty of good faith.   Therefore, I will grant defendant's motion for summary judgment as to the first part of this claim.

Plaintiff cannot prevail on its claim that defendant breached the duty of good faith by failing to give plaintiff complete information about the market value adjustment.  It is undisputed that plaintiff never asked defendant for any information that defendant failed to provide.

This leaves the allegation that defendant gave plaintiff misleading information relating to the fixed account holdings.  As I explained in the context of plaintiff's three claims of misrepresentation, it is possible that plaintiff could show that the fact sheets contained misleading information.  However, plaintiff cannot show that if it relied on the fact sheets in deciding whether to extend the competitive evaluation process, its reliance was reasonable.  Without reasonable reliance, plaintiff cannot establish any damages.  Therefore, I will grant summary judgment on this entire claim.

C. Negligent, Intentional and Strict Liability Misrepresentation

Plaintiff alleges three separate claims of tortious representation, alleging that defendant made representations in the March 2005 and September 30, 2005 fact sheets and in the September 8, 2005 email that were misleading, that defendant acted improperly (either negligently or intentionally or under strict liability) in making these representations and that plaintiff relied reasonably on the statements to its detriment by delaying the termination of the group contract until the completion of the competitive evaluation process. Without the fact sheets and the misrepresentations contained in them, plaintiff asserts, it would have not have waited to obtain opinions from its employees.  These allegations are sufficient to state actionable claims of misrepresentation.  Whipp v. Iverson, 43 Wis. 2d 166, 169-70, 168 N.W.2d 201, 203-04 (1969) (all forms of tortious misrepresentation must have three common elements: factual statement made by defendant;  factual statement must be untrue; and plaintiff must believe misrepresentation and rely upon it to his disadvantage. In addition, "[i]n strict liability, the misrepresentation must be made on the defendant's personal knowledge or under circumstances in which he necessarily ought to have known the truth or untruth of the statement and the defendant must have an economic interest in the transaction"; in intentional misrepresentation, "the defendant must either know the representation is untrue or the representation was made recklessly without caring whether it was true or false and with intent to deceive and induce the plaintiff to act upon it to the

21

plaintiff's pecuniary damage"; in negligent misrepresentation, "the defendant need only fail to exercise ordinary care in making a misrepresentation of in ascertaining the facts," when under a duty of care and voluntary assumption of duty.)

At the outset, it is questionable whether defendant made any statements to plaintiff that would have misled plaintiff into thinking that it ran no financial risk if it delayed its final choice of a provider.  Certainly the September 8, 2005 email would not have had this effect; it contained the truthful information that the September estimate of the market value adjustment was $43,290 and it attached an explanation of the way in which defendant calculated the adjustment.  Defendant supplied the March 31, 2005 statement, not in connection with risk assessment but as part of its effort to persuade plaintiff to continue the parties' relationship into the future.  It did not supply the September 30, 2005 fact sheet; plaintiff obtained it from defendant's website.  It is undisputed that defendant never represented to plaintiff that the statements in the fact sheets could be relied upon to determine market volatility or its effect upon the market value adjustment.  In making the fact sheets available on the website, defendant was not holding them out as reliable information for estimating a market value adjustment but was advising the public about the general stability of its funds, presumably in the hope that sponsors like plaintiff would choose defendant for their deferred compensation plans.

Setting aside the question whether the fact sheets could be considered

22

misrepresentations by defendant when they were never provided to plaintiff by defendant in an attempt to inform plaintiff about the risks or mechanisms of market value adjustment, were they misleading in and of themselves?  In particular, because plaintiff is alleging that the misleading statements lulled it into thinking it could take its time in making the final decision about the benefits provider, it has to show that the fact sheets were misleading in respect to what they conveyed about market volatility.  It is not relevant whether they were misleading in other ways.

One look at the fact sheets is sufficient to show that they were not intended to advise plan sponsors such as plaintiff how to calculate a market value adjustment or to supply any information that could be relied upon in estimating such an adjustment.  They stated clearly that they did not include all information.  For example, under "Types of Holdings," the March 31, 2005 and September 30, 2005 fact sheets listed "*examples* of General Account assets having the largest concentrations."  Exh. #15 to Hans Dep., dkt. #37, at WC000152, WC000150 (emphasis added).  The fact sheets included a statement to the effect that mortgages were not rated and the pie chart showed that mortgages made up almost 23% of the fund corpus.  Plaintiff asserts that defendant's statements that it used Baa as a rating of the complete portfolio is a concession that the "A" quality rating in the fact sheets was erroneous and misleading.

As an additional example of a misleading statement, plaintiff cites the durations

23

shown on the March 2005 and September 2005 fact sheets, which were 4.2 and 4.3 respectively.  According to plaintiff, the true duration for the fixed account for the USCM/NACo cases (which included plaintiff's) was 5.73.  Although the fact sheets were titled "National Fixed Account for USCM/NACo Cases," the average quality and average duration figures given were for defendant's general account, of which the USCM/NACo cases are a subset.  The December 2005 fact sheet, which plaintiff obtained in mid-February 2006, made no reference to duration and included the information that the "A" rating applied to only part of the portfolio.  Plaintiff believes that the omission of the duration reference is a concession by defendant that the earlier duration figures were misleading.

It is possible that plaintiff could prove that the fact sheets were misleading to the extent they were titled "USCM/NACo Cases" but actually showed information for the general account of which the USCM/NACo cases were only a part and included confusing information about duration and average quality.  However, it is clear that if plaintiff relied on the fact sheets in deciding that it was safe to extend the competitive evaluation process, its doing so was unreasonable.  At the same time that plaintiff had the March 2005 fact sheet in its possession it also had a copy of defendant's Market Value Adjustment Assumptions, which advised plaintiff that defendant assumed that each asset in the hypothetical account it used for the adjustment had a credit rating of Baa and that defendant applied the Lehman Corporate Baa Credit Yield.  Once it knew this, it should have known

24

that the A average quality rating shown on the fact sheet had no relation to the market value adjustment.  No reasonable person would have relied on the fact sheets in the face of the information contained in the adjustment assumptions.

Wisconsin law requires "justifiable" reliance.  Ritchie v. Clappier, 109 Wis.2d 399, 404-405, 326 N.W.2d 131,134 (Ct. App.1982) (quoting Kiefer v. Fred Howe Motors, Inc., 39 Wis.2d 20, 29, 158 N.W.2d 288, 292-93 (1968)); see also Restatement (Second) of Torts, § 537; Jacobsen v. Whitely, 138 Wis. 434, 437, 120 N.W. 285, 286 (1909) ("courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him") (citations omitted).

In fact, plaintiff did not rely on the information in extending the competitive evaluation process.  It did not even try to assess the risk it might run in choosing not to terminate the contract immediately.  Had it done so, it would have obtained more information about the Lehman credit index or at the least, asked defendant for more frequent updates on the anticipated amount of the adjustment.  It did neither of these things.  Moreover, it had its own reason for extending the evaluation process, which was to insure the approval of its employees for the deferred compensation plan provider it selected.

It is even more questionable whether plaintiff could prove that any reliance on the

25

fact sheets harmed it. Even if it had not chosen to extend the process, it could not have terminated its contract with defendant in September because it had not yet made a final decision to choose ICMA as the only provider. Once that choice was made, plaintiff would have had to wait four months before withdrawal could occur. Plaintiff has not tried to estimate what damages it would have suffered or avoided had it made its decision earlier than it did.

It is not necessary to pursue these questions further because plaintiff cannot prove that it would have been justified in relying on the fact sheets in assessing the risk of waiting to terminate the fixed contract. Without justifiable or reasonable reliance, it has no actionable claim of misrepresentation of any kind.


## D. Breach of Fiduciary Duty by Defendants

Plaintiff alleged in the complaint that both defendants breached fiduciary duties owed to plaintiffs under the fixed contract and the plan document. I have ruled previously that the plan document is not a binding document as to either defendant, so there can be no breach of duties by defendants under that document. As to the fixed contract, neither defendant can be held liable for breach of fiduciary duties because the law does not allow a party to assert a tort claim based upon a duty that arises under contract.

Defendant Nationwide Retirement had no duties under the fixed contract because it

26

was not a party to that contract, it did not hold any of the Plan assets directed into the fixed account and it did not calculate the market value adjustment.  Plaintiff alleges that defendant Nationwide Retirement made representations about the quality of the investments through the fact sheets, but it has adduced no evidence to support its allegation.

### E. Damages

Defendant contends that plaintiff did not bear any of the cost of the market value adjustment and therefore has no claim for damages, that it cannot substantiate any claim for damages because ICMA paid the market value adjustment in exchange for a reduction in the amount of revenue sharing the Plan would receive from ICMA over the course of its contract with plaintiff and that any damages to which it would be entitled would be speculative.  The last of these contentions might raise problems for plaintiff if it prevails on its remaining claim against defendant but the first two are without merit.  Plaintiff has standing to sue on behalf of its plan participants, who were damaged by the less favorable terms ICMA gave plaintiff.

Finally, defendant asserts that plaintiff failed to mitigate its damages by failing to take the five-year withdrawal option.  The present record does not indicate whether this option would have resulted in a net gain for plaintiff or the plan participants.  It is a matter that can be reserved for trial, if plaintiff proves liability.

27

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Nationwide Life Insurance Co. and Nationwide Retirement Solutions, Inc. is GRANTED with respect to plaintiffs Waukesha County and Waukesha County Deferred Compensation Plan's claims that

1. Defendants breached the fixed annuity contract by failing to provide plaintiffs information about the manner in which they calculated the market value adjustment on the fund (Count 1);

2. Defendants breached the duty of good faith and fair dealing inherent in the fixed annuity contract (Count 2);

3. Defendants made misrepresentations that misled plaintiffs into extending the termination of the fixed annuity contract between the parties (Counts 3, 4 and 5);

4. Defendants breached a fiduciary duty to plaintiff (Count 8).

The motion for summary judgment is DENIED with respect to plaintiff's claim that defendant Nationwide Life breached the fixed annuity contract between the parties  by the

28

manner in which it calculated the market value adjustment (Count 1).

Entered this 12th day of October, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

29

30