IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WAUKESHA COUNTY, WISCONSIN
and WAUKESHA COUNTY DEFERRED
COMPENSATION PLAN,

                      Plaintiffs,

       v.

NATIONWIDE LIFE INSURANCE
COMPANY and NATIONWIDE
RETIREMENT SOLUTIONS, INC.,

                      Defendants.

OPINION AND ORDER

06-cv-656-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Defendants Nationwide Life Insurance Company and Nationwide Retirement Solutions, Inc. have renewed the motion for judgment as a matter of law made at the close of plaintiffs' case and renewed at the end of the entire case.  Now that judgment has been entered in the case on the jury's verdict for plaintiffs Waukesha County, Wisconsin and Waukesha County Deferred Compensation Plan, I will treat the motion as one made pursuant to Fed. R. Civ. P. 59(e) to alter or amend the judgment.  Because the only two parties with any real interest in this case are plaintiff Waukesha County and defendant Nationwide Life Insurance Company; from this point on, I will disregard the other two

1

parties.

For twenty years, defendant managed the investments in plaintiff's employees' deferred compensation plan. In early 2006, plaintiff advised defendant that it intended to withdraw the plan's funds and invest them with a different entity. Plaintiff chose to withdraw the funds in a lump sum rather than over a period of five years, although it knew that the lump sum option carried a fee in the form of a "market value adjustment" approximating the loss or gain that would result if defendant were actually to sell the the securities backing up the investments in the plan. In September 2005, defendant estimated the adjustment would be about $43,230 and told this to plaintiff. However, by the time plaintiff reached its final decision to switch providers, gave notice to defendant of the planned termination and waited the required four months for withdrawal, interest rates rose nationally and the market value adjustment ballooned to about $541,925, or 4.9% of the value of the funds.

Plaintiff promptly sued, contending that defendant had breached the contract in two respects: the manner in which it calculated the market value adjustment and in failing to provide adequate information to plaintiff. In addition, it contended that defendant had breached the covenant of good faith, made misrepresentations that were negligent, intentional or subject to strict liability, breached its fiduciary duty to plaintiffs, breached the restated plan documents and committed unfair trade practices. In a series of orders, I

2

dismissed all of plaintiff's claims with the exception of the claim that defendant breached the contract in the manner in which it calculated the market value adjustment. This claim remained alive on what I considered the slim possibility that plaintiff could prove at trial that defendant's market value adjustment was not the equivalent of the net capital loss that defendant would incur if the investments in plaintiff's deferred compensation plan were liquidated to make the lump sum withdrawal. The case proceeded to trial, where plaintiff secured a damages verdict from the jury of $319,000. Although plaintiff prevailed at trial, defendant preserved its right to move for alteration or amendment of the judgment pursuant to Rule 59(e) by moving for judgment as a matter of law at the appropriate times.

Defendant contends that its motion should be granted because the court erred in finding that plaintiff's expert was qualified to testify and in then allowing the expert to give opinions at trial about defendant's actuarial assumptions and its calculation of the market value adjustment. After reviewing the parties' briefs and the transcribed portions of the trial testimony, I am left with the firm conviction that defendant is correct. Plaintiff's expert did not meet the criteria in Fed. R. Evid. 702 for testimony by experts. He did not have the education and experience that would enable him to analyze and evaluate the actuarial assumptions and calculations required to administer a sound, long term, fixed income investment plan. His testimony was not based upon sufficient facts or data and it was not the product of reliable principles and methods. Because plaintiff's case rested entirely upon

3

the expert's testimony, I will grant the Rule 59(e) motion.  I do so reluctantly, recognizing the time and effort that both parties expended in trying the case.

In hindsight, it was error not to hold a pretrial hearing to consider defendant's motion in limine to look more closely at Elliot Dinkin's qualifications as an expert in the field of group fixed annuity contracts.  It was another error to allow him to testify about the spread sheet purporting to be a replication of defendant's market value adjustment calculations. As the evidence showed, Dinkin is not an actuary; he has no specialized training, experience or education in the field of actuarial science.  He is not even an accountant, let alone a certified public accountant.  Granted, he has an undergraduate degree in economics and an MBA in finance and accounting and he has extensive experience in his own field.  This experience includes almost 25 years of experience designing and implementing deferred compensation programs and doing financial modeling analyses of such plans.  It does not follow, however, that he has a sufficient understanding of actuarial science and its use in the investment and insurance industries to enable him to develop his own market value adjustment calculation or to analyze an existing one.  Although Dinkin testified that he has specific experience with market value adjustments and in advising clients of possible market value adjustments, he admitted he had never analyzed the working of such a calculation before this trial, never tried to calculate a hypothetical net capital loss and never evaluated the assumptions that underlie a market value adjustment formula.  He is not familiar with

4

the assumptions on which market values are based generally or in this specific instance.  He admitted that he did not have sufficient information regarding the actual behavior of the bonds in the "pool" that included plaintiff's fund to make a damage calculation.  (Defendant classifies its public sector funds as Pool 013.  This is a hypothetical pool of assets assigned to defendant's public sector liabilities.  Assigning these funds to a separate pool allows defendant to develop investment policies specific to the public sector funds.)

Dinkin never testified that he had experience or training in statistics, life insurance pricing or investments.  His background and experience show that he does not have the experience or education to qualify as an expert on the way in which group fixed annuity contracts are structured or how they operate.  In light of his lack of qualifications to form opinions about the narrow and specialized field of actuarial calculations in insurance, he should not have been allowed to testify about the legitimacy of defendant's market value adjustment.

Even if Dinkin had training or experience in actuarial science and the insurance and investment industries, the testimony he gave at trial fell short of satisfying the requirements of Rule 702.  It was not based upon sufficient facts or data and it was not the product of reliable principles and methods.  Defendant never said that his opinions represented sound actuarial practice or said that his conclusions were based on actuarial principles.  Presumably he was not in a position to do so.

5

Three particular areas of Dinkin's testimony jump out upon examination of the record. First, he testified that in determining market value, it was improper for defendant to rely on the assumption that the Fixed Account portfolio backing up defendant's liability to plaintiff's employees is made up of ten-year callable bonds, 100% of which are called within five years. Not only is Dinkins wrong about the assumption on which defendant was relying, he gave no reasoning for his assertion that it would have been wrong for defendant to have relied on the assumption, whether it was true or not.

To start with the accuracy of Dinkin's understanding of defendant's assumption, no facts or data in the record support Dinkin's testimony. The one witness plaintiff called on this point testified to the contrary. Todd Statczar is associate vice president in defendant's finance and actuarial department, with responsibility for the public sector line of business that included plaintiff's deferred compensation plan. He testified that defendant's formula assumes that all 10-year semi-annual coupon bonds have call protection for five years and that, after five years, they are subject to call. Whether they are called in fact depends on what happens to their rates. If rates rise, bond issuers will have no incentive to call their bonds and purchase new ones at higher rates.

Dinkin's testimony is also contrary to the deposition testimony of Joel Buck, senior investment professional and portfolio manager for fixed annuity, public sector, pensions and surplus accounts. Buck testified that fewer than half of the bonds are actually called within

6

five years.

But as I noted, Dinkin's testimony suffers from another flaw beyond his mistaken understanding of the assumption relating to callable bonds. He never explained why such an assumption would be improper, unsound or unfair to plaintiff's employees. It is not enough for him to say that in the real world, not all the bonds are called and that treating the bonds as if they were called mid-maturity caps the upside potential. (By "capped mid-maturity," he meant that the discounted cash flow is not allowed to grow and appreciate. Trial Tr., dkt. #136, at 140.) He must explain why treating them as callable in five years is wrong from an actuarial standpoint and he must be able to show that in reaching his opinion he has applied principles and methods accepted by other experts in the field. Rather than do either of these things, he simply adopted an approach that was the opposite of what he thought defendant used and proceeded to calculate the difference in the market value adjustment between the two. In other words, he purported to calculate what the monetary difference would be if defendant had adopted the assumption that none of the bonds were called in five years. He did not try to justify his approach but left it up to the jury's imagination to figure out why using a no-call assumption would be a more accurate reflection of the reality of plaintiff's account than defendant's assumption that the bonds were callable in five years. In fact, he admitted under cross examination that he did not have sufficient information to evaluate the reasonableness of defendant's assumption. Trial Tr., dkt. #137,

7

at 14-15:

> Q: So sitting here today, you don't know what would be a reasonable assumption as to when the bonds could be callable, right?
>
> A. That's correct, and that's why we demonstrated the illustration of the impact on it making.

Plaintiff concedes that Dinkin did not have sufficient information about the actual behavior of the bonds in Pool 013 to make a damages calculation, Plt.'s Br. in Opp. to Dft.'s M., dkt. #149, at 31, but does not admit that it was error for him to testify during the liability phase of the trial to the unreasonableness of defendant's assumption.  The two positions are at odds.  If Dinkin did not have enough information to calculate damages because he did not know what a reasonable assumption would be, he lacked the information necessary to reach a reliable opinion about the validity and reasonableness of the assumption defendant was using in its treatment of the callable bonds.

On a second point, Dinkins testified that it was error for plaintiff to use book value for valuing the assets attributed to plaintiff's fund and then to use an index to determine market value.  He supported this opinion by explaining that using one means of valuing book value and another for determining market value is comparing apples to oranges.  This kind of testimony does not meet the requirements of Rule 702.  Figures of speech are no substitute for facts or accepted principles.

Later, in the damages phase of trial, Dinkin added one bit of testimony to explain his

8

position about the incompatibility of actual book values and market value indices.  He testified that in determining the book value of bonds at their original yield rate, defendant was not simply taking the coupon value of the bond but was taking the earned rate on new money that had been earned on all of defendant's investments.  Trial Tr., dkt. #138, at 19. I can neither understand the point of this testimony nor find any source in the record for it. Dinkins did not explain it at trial and plaintiff does not explain it in its brief or cite to a factual source for the statement.

It is true, as Dinkin pointed out, that defendant was not using real assets but hypothetical ones when calculating book value, but Dinkin did not explain why this would make any difference.  It is not a self-evident proposition.  It is commonplace for a person trying to determine the loss he would incur in selling a car to compare the historical fact of the actual purchase price with the present day value set out in the Blue Book, the automotive equivalent of an index.  If Dinkins had reason to think that valuing bonds was different, he had an obligation to explain that to the jury and to explain the facts and accepted principles and methodology supporting his opinion.  His failure to do so is another instance in which his testimony failed to meet the requirements of Rule 702.

The third shortcoming in Dinkin's testimony was his position that defendant calculated the market value adjustment improperly by including a default risk charge. This was wrong, he said, for two reasons.  First, the default charge was only an internal accounting

9

charge.  Second, it was improper for defendant to factor it into the market value adjustment after having deducted it previously.  Both "reasons" lack a factual basis and adequate explanation.

Todd Statczar testified that whenever one of Pool 013's assets became worthless, such as a corporate bond on which the issuer defaulted, defendant's corporate division bought the worthless bond at book value from the pool.  The default risk charge is an internal service charge assessed on all of the pool's assets to offset the expenses that the corporate division has incurred.  It varied, depending on actual experience.  At the time plaintiff withdrew its employees's funds, the rate was .22%.

According to Statczar, after every quarter defendant analyzed its portfolio performance, deducting overhead expenses, including the default risk charge.  From the net interest earnings, it determined the guaranteed interest rate for the fixed contract for the next quarter.  When it determined the book value of the plan's assets for plan withdrawal purposes, it calculated book value by using the earned rate of the assets, net of expense loads that included the default risk charge.  (In other words, as I understand it, if a participant "owned" a bond worth $1000 that paid 5% per annum, the book value of the bond after one year would be $1,050, with the interest on the loan treated as an increase in the book value of the bond.  When the participant withdraw her funds, however, defendant would calculate the book value as the purchase price of the bond plus an added rate calculated net of

10

overhead expenses, including the default risk charge.  Thus, if she sold just after the first year, her withdrawal would be slightly less than $1,050 because the added interest would be reduced by overhead expenses.)

Dinkins testified that the charge was not a reasonable one but he testified as well that he did not know enough about the calculation to say whether it was an average of the different default risk charges assigned to the different assets in the Pool 013 portfolio.  Trial Tr., dkt. #137, at 27.  His view was that an internal accounting is not a legitimate expense. Id. at 26.  He offered no factual basis for this view, which was contradicted by the only fact testimony in the record.

In its responsive brief, plaintiff does not defend Dinkin's view of the default risk charge as an illegitimate internal accounting expense.  Instead, it argues that the real reason for not including it in the market value adjustment is that it was double-counting.  Again, this argument is unsupported by any factual evidence in the record or by any principles or methodology cited by Dinkin.  In fact, Dinkin conceded that he did not know enough about the charge to say what it was or was not.

In summary, it is evident that Dinkin was not qualified to testify as an expert on the subject matter of this lawsuit.  His testimony must be struck because it did not meet the requirements of Rule 702.  Unfortunately for plaintiff, without the testimony, it has no case against defendant.  Therefore, I will vacate the judgment entered on  November 8, 2007 and

direct the court to enter an amended judgment in favor of defendants on all eight claims of plaintiff's second amended complaint.  <u>Deimer v. Cincinnati Sub-Zero Products</u>, 58 F.3d 341 (7th Cir. 1995) (after striking expert's testimony, which was only evidence of plaintiff's claim, court acted properly in directing verdict for defendant).

ORDER

IT IS ORDERED that the motion of defendants Nationwide Life Insurance Company and Nationwide Retirement Solutions, Inc. to alter or amend the judgment of November 8, 2007, is GRANTED.  FURTHER, IT IS ORDERED that the November 8, 2007 judgment is VACATED.  The clerk of court is directed to enter an amended judgment in favor of defendants on all eight claims of the second amended complaint filed by plaintiffs Waukesha County, Wisconsin and Waukesha County Deferred Compensation Plan.

Entered this 20th day of February, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

12